UNITED STATES of America,
Plaintiff–Appellee,

v.

Daniel WARE, Defendant–Appellant.

No. 88–2435.

United States Court of Appeals,
Seventh Circuit.

Argued April 19, 1989.

Decided Oct. 1, 1990.

Jacqueline O. Stern, David J. Stetler, Asst. U.S. Attys., Office of the U.S. Atty., Criminal Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

John A. Meyer, Chicago, Ill., for defendant-appellant.

Before CUMMINGS, POSNER, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

This case concerns the authority of an Illinois police officer to seize a weapon

from a get-away vehicle followed into Indiana from the scene of an Illinois robbery. Also at issue is the extent to which an expert witness may use personal research to testify regarding the interstate transportation of weapons.

At approximately 1:30 a.m., on October 19, 1986, a white male using a sawed-off shotgun attempted to rob the Pour House Tavern in Calumet City, Illinois. During the robbery attempt the owner of the establishment called the Calumet City Police. Shortly thereafter, the Calumet City Police Department issued a general radio dispatch that an attempted robbery had just occurred at the Pour House Tavern and that the suspect had fled.

Calumet City Police Officer Bertha Shannon was on patrol in the area and upon hearing the radio dispatch, she immediately headed toward the crime scene. As she continued driving, a second radio dispatch described the robbery suspect. At about this time, a small white car that Officer Shannon had observed earlier pulled away from the curb in front of her and traveled east toward the Indiana state line. A third radio transmission aired and the dispatcher described the robbery suspect's vehicle as a small white car. Officer Shannon followed the white automobile for a distance of about five blocks from Calumet City, Illinois, across the state line into Hammond, Indiana, and into the parking lot of St. Margaret's Hospital.[1]

Officer Shannon called in the license plate number of the white car and was informed that it was registered to Daniel Ware and Betty Scott. Officer Shannon requested assistance and parked about 25 feet away from the vehicle she had under surveillance. Two male occupants got out of the white automobile. Ware exited the passenger side and another man got out of the driver's side. They walked to the front door of St. Margaret's Hospital and attempted to enter. The doors were locked and they walked to the hospital courtyard

area leading to the other side of the building. Officer Shannon lost sight of Ware and the other man. At about the same time, Officer James Rupcich, also of the Calumet City Police Department, arrived in another squad car. He had heard the radio transmissions and proceeded to the hospital location to assist Officer Shannon. Officer Shannon spoke with Officer Rupcich and then drove to the other side of the hospital building. Shortly thereafter, Officer Rupcich heard another radio dispatch which indicated that two suspects had been taken into custody on the opposite side of the hospital. At that point, Officer Rupcich walked to the white automobile, looked through the passenger window and saw the butt of a shotgun protruding from under the passenger seat. The officer retrieved the weapon from the automobile and noticed a shotgun shell also on the passenger side of the car. He unloaded the gun, which had one shell in it, and turned over the shotgun and two shells to an evidence technician from the Hammond, Indiana Police Department. Daniel Ware was subsequently identified by three witnesses as the man who attempted the armed robbery.

Ware was charged with being a convicted felon in possession of a firearm in violation of 18 U.S.C.App. II § 1202(a)(1), and with possession of an unregistered firearm in violation of 26 U.S.C. § 5861(d). Following a jury trial guilty verdicts were returned on both counts. Ware was sentenced to fifteen years imprisonment on count one, and ten years imprisonment on count two. The sentence in count two runs concurrently with the sentence imposed in count one. Ware appeals his convictions arguing that the court erred in admitting the shotgun and shells into evidence and that the testimony of an expert witness was improper. We find no error and affirm.

## DISCUSSION

A. *Admission of Evidence Seized from Automobile*

Prior to trial Ware filed a motion to suppress regarding the shotgun and shells

---

1. The cities of Hammond, Indiana, and Calumet City, Illinois, are divided by the Indiana/Illinois state line. St. Margaret's Hospital is located in Hammond, Indiana, and immediately adjacent to the Illinois state line and Calumet City, Illinois.

seized by Officer Rupcich from the getaway vehicle. Ware argued that an Illinois law enforcement officer had no legal authority to act as a law enforcement officer in the state of Indiana. Following a hearing the district judge denied the motion to suppress, holding that the Calumet City police officers had been in hot pursuit of Ware's vehicle and therefore were justified in acting outside their jurisdiction. Further, the judge found that the examination of the car and seizure of the shotgun and shells were justified to ensure the immediate safety of the investigating officers and others in the area.

On appeal, Ware argues that the trial court erred by denying the motion to suppress the shotgun and shells because: (1) the search of his car by Officer Rupcich was not authorized under Indiana law; and (2) there were no exigent circumstances to justify the search.

We will affirm a district court's denial of a motion to suppress evidence unless it is clearly erroneous. *United States v. D'Antoni*, 856 F.2d 975, 978 (7th Cir.1988); *United States v. Binder*, 794 F.2d 1195, 1199 (7th Cir.), *cert. denied*, 479 U.S. 869, 107 S.Ct. 234, 93 L.Ed.2d 159 (1986).

■ Ware explicitly repudiates reliance on the fourth amendment of the United States Constitution. Rather, he argues that Officer Rupcich had no legal authority to conduct a search [2] in the state of Indiana and therefore the shotgun and shells should have been suppressed. An initial issue raised by this argument is that if Officer Rupcich had absolutely no governmental authority in Indiana and thus was a private person, then the state and federal constitutional prohibitions do not apply and suppression of the evidence would not be a

remedy. *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984); *Hutchinson v. State*, 477 N.E.2d 850, 853 (Ind.1985); *Torres v. State*, 442 N.E.2d 1021, 1023 (Ind.1982). We will address Ware's arguments, however, because in light of all the circumstances here, it is arguable that Officer Rupcich was acting to assist Indiana law enforcement efforts. *See United States v. Feffer*, 831 F.2d 734, 739 (7th Cir.1987) (the determination of governmental involvement in a search and seizure is made in light of all the circumstances with the two critical factors being whether the government acquiesced in the intrusive conduct and whether the private party's purpose for conducting the search was to assist law enforcement efforts or to further his own ends).

Ware relies on a decision of the Indiana Supreme Court to support his argument that the "search" was unauthorized under Indiana law. He argues that in *Walker v. State*, 503 N.E.2d 883 (Ind.1987), the court held that a search conducted by an "arresting person," other than an Indiana police officer, was limited to the area immediately under the arrested person's control. Therefore, he argues, the search by Officer Rupcich was unauthorized under Indiana law because neither Ware nor his companion were near the car when Officer Rupcich looked through its windows.

Initially, we do not read *Walker* to set forth limitations on the right to search. In *Walker*, Chicago police officers during surveillance, followed three suspects as they drove into Indiana. Later, two of the suspects were observed entering an apartment while the third remained in the car. When the two suspects emerged from the apart-

---

**2.** Because Ware does not challenge the validity of his arrest by Officer Shannon, a discussion of the Indiana "fresh pursuit" statute is unnecessary because that statute enunciates the standards for the authority of an officer of another state to *arrest* a felony suspect *in Indiana*. Here, Officer Rupcich did not arrest Ware. Officer Shannon clearly was in "fresh pursuit" of Ware under the Indiana statute. The statute provides:

Any member of a duly organized state, county or municipal peace unit of another state who

enters this state in fresh pursuit, and continues within this state in such fresh pursuit of a person in order to arrest him on [the] ground that he is believed to have committed a felony in the other state, shall have the same authority to arrest and hold such person in custody as has any law enforcement officer of this state to arrest and hold in custody a person on the ground that he is believed to have committed a felony in this state.

Ind.Code Ann. § 35–33–3–1 (West 1986).

ment they were carrying articles which they did not carry into the building. The Chicago police officers checked the apartment to confirm that it had been burglarized and immediately informed the local Indiana police. As the Indiana police were en route to the scene of the burglary, the Illinois police informed the Indiana police that two of the suspects were attempting to leave. The Chicago police officers were asked to arrest them. They did so, and seized items from their persons and from the open trunk of their car.

The two suspects arrested by Illinois police were convicted. They argued on appeal that because the Chicago police officers had no legal authority in Indiana the trial court erred in refusing to suppress the evidence seized by them. The Indiana Supreme Court held that the arrest was valid under the Indiana citizens arrest statute. *Id.* at 886. Further, the court said, "in effecting [an arrest without a warrant], the arresting person may also search the area immediately under the arrested person's control." *Id.* Read in context it is plain that the court was not attempting to limit the right of an arresting person to search, but was merely noting that the search by the Illinois police in the case before it was proper.

Moreover, under the circumstances here Officer Rupcich did not conduct a "search" of the car. Ware does not argue that the laws or constitution of Indiana offer him a broader definition of what constitutes a "search." Indeed, both the Indiana and federal decisions on point hold that there is no expectation of privacy and thus no "search" when a person merely observes something through an automobile's window.[3] *See Avant v. State,* 528 N.E.2d 74, 76 (Ind.1988) (merely looking through windows of a vehicle to see that which is inside is not a search because officer did not have to pick up, open up, or pull back anything to see the clothing lying on the back seat);

*Marsh v. State,* 477 N.E.2d 877 (Ind.1985) (when officer aimed a flashlight into vehicle and observed the butt of a gun, two ski masks and a money bag, the evidence taken from the car was in plain view and therefore was not seized as the product of a search); *Cheeks v. State,* 266 Ind. 190, 361 N.E.2d 906, 909 (1977) (using a flashlight to view the back seat of vehicle and seize a purse in open view did not make the seizure the product of a search); *Denson v. State,* 263 Ind. 315, 330 N.E.2d 734, 737 (1975) (there was no search when the pistol was lying on the front seat of the car in plain view); *Frith v. State,* 263 Ind. 100, 325 N.E.2d 186, 191 (1975) (items seized were in plain view of the police as they gathered around the car and thus are not products of a search); *accord Texas v. Brown,* 460 U.S. 730, 740, 103 S.Ct. 1535, 1542, 75 L.Ed.2d 502 (1983) (there is no legitimate expectation of privacy regarding the portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers and thus the observation of the interior of the car was not a search); *United States v. Head,* 783 F.2d 1422, 1426–27 (9th Cir.), *cert. denied,* 476 U.S. 1171, 106 S.Ct. 2895, 90 L.Ed.2d 982 (1986) (no search where the interior of a van was inspected by looking through the van's window).

 We add that even if this was, in fact, a warrantless search, it would be permitted because exigent circumstances existed. The district court found that "it was prudent under the circumstances … that an inspection be made of the area and particularly of the automobile … [in order to ensure the safety of] the investigating officers … [and] all persons in the area." Exigent circumstances exist when there is a reasonable belief by police that their safety or the safety of others may be threatened. *United States v. Dowell,* 724 F.2d 599, 602 (7th Cir.), *cert. denied,* 466 U.S.

---

**3.** The defendant does not argue that the *seizure* of the shotgun and shells was unauthorized or improper. Under the circumstances here, it is obvious that the intrusion into the automobile to retrieve the shotgun was proper because when Officer Rupcich properly looked through

the window he did not know until then that the shotgun was under the seat and it was clearly evidence of a crime subject to seizure. *See Texas v. Brown,* 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983); *United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982).

906, 104 S.Ct. 1683, 80 L.Ed.2d 157 (1984). Ware argues that it was clearly erroneous for the district court to find that exigent circumstances existed because Officer Rupcich was not threatened or endangered and no one attempted to approach Ware's vehicle while it was parked in the hospital parking lot. We disagree.

Officer Rupcich knew that an attempted armed robbery had occurred and that within a few minutes another officer pursued a car matching the description of the car used by the robber. It was reasonable for Officer Rupcich to believe that the gun used in the attempted robbery was either in the car or had been discarded by the defendant. In either case, exigent circumstances justified the retrieval of the shotgun and shells to protect himself and the public. *See Williams v. State,* 271 Ind. 656, 395 N.E.2d 239, 243 (1979). In *United States v. White,* 607 F.2d 203, 208–09 (7th Cir.1979), *cert. denied,* 449 U.S. 1114, 101 S.Ct. 926, 66 L.Ed.2d 843 (1981), we addressed very similar circumstances and said:

> The agents had reason to believe that [the defendant] had recently had a gun, presumably loaded ... and had either hidden the gun within the automobile or thrown it out the window while he was driving through the airport.... If the weapon ... had been thrown out of the automobile in a busy airport, it might well "fall into untrained or perhaps malicious hands" and constitute a danger to the general public. *Cady v. Dombrowski,* 413 U.S. 433, 93 S.Ct. 2523 [37 L.Ed.2d 706] (1973).
>
> The agents had the right and duty to avert possible danger to themselves and the public by finding and holding the gun. The most expeditious way to go about finding it was to search the limited area of the automobile before expanding the search to other areas.... The need to locate and take possession of a dangerous instrumentality was an exigent circumstance which justified the warrantless search. The motion to suppress was properly denied.

This rationale directly applies here and the district judge's determination was not clearly erroneous.

B. *Propriety of the Expert Testimony*

During the course of the trial the government offered the expert testimony of Edward Prebe, a special agent with the Bureau of Alcohol, Tobacco and Firearms (ATF), to prove an element of count one— that the firearm had traveled in interstate commerce. An agent with more than 17 years experience, Prebe testified that he was trained in the identification of shotguns and in determining whether weapons have traveled interstate. As part of his duties, he reads and consults gun manuals, magazines and similar documents.

Agent Prebe testified that the weapon found in Ware's car was a sawed-off shotgun manufactured by Harrington & Richardson. He was asked whether he was familiar with the location of Harrington & Richardson's manufacturing plants. Defense counsel objected on the basis that any such testimony would be based on hearsay. The government countered that the agent's personal research had determined that Harrington & Richardson only manufactured guns in Massachusetts. Defense counsel then argued that this was not an area which "necessitate[s] expert testimony." The objection was overruled and Agent Prebe testified that the shotgun was stamped with the words "Gardner, Massachusetts, Made in the United States." His research revealed that Harrington & Richardson manufactured guns at two locations, both of which were located in Massachusetts. He further testified that based on his research, Harrington & Richardson had never operated a firearms manufacturing facility in the state of Illinois. Agent Prebe stated, over objection, that in his opinion the gun had traveled in interstate commerce.

On cross-examination, Agent Prebe testified that although he had never personally visited the Harrington & Richardson factories in Massachusetts, his testimony was based, in part, on an historical list of firearms manufacturers in the United States provided by ATF. In addition, he had pre-

viously contacted the manufacturer by mail and telephone. Defense counsel asked Agent Prebe if he knew when the shotgun involved in the case was manufactured. He answered that, based on a trace performed by another ATF agent, the shotgun was manufactured in either 1983 or 1984. Agent Prebe testified that although Harrington & Richardson had gone out of business by the time of trial, the company's business records were in the custody of ATF in Washington. On redirect examination, Agent Prebe testified that he also consulted gun books, magazines, and digests to determine that the shotgun was manufactured in Massachusetts.

When Agent Prebe was finished testifying, defense counsel moved to strike Prebe's testimony because the government was in charge of Harrington & Richardson's records and therefore it was error not to produce the records. The court denied the motion to strike.

Ware makes the following arguments concerning the expert testimony given by Agent Prebe:[4] (1) the testimony and opinion concerning whether the shotgun traveled interstate was improper under Federal Rule of Evidence 702 because they were not outside of the understanding of the average juror; and (2) the testimony was improper under Federal Rule of Evidence 703 because his opinion was not based on evidence which other experts would reasonably rely upon.

We give great deference to a district judge's decision to admit expert testimony and will reverse such a decision only if it was manifestly erroneous. *United States v. Lundy*, 809 F.2d 392, 394 (7th Cir.1987).

■ Ware's first argument is that Agent Prebe's testimony that the shotgun was manufactured in Massachusetts and in his

opinion had traveled in interstate commerce violated Rule 702. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed.R.Evid. 702. A district judge is required to make two determinations on admissibility of testimony under Rule 702. One is whether the witness is properly qualified as an expert. Ware does not challenge the district judge's determination that Agent Prebe is an expert in firearms investigations and identification. The other determination is whether the testimony could assist the jury in determining a fact in issue. The district judge determined that it could.

An essential element of count one which had to be proved by the government was that the shotgun had traveled in interstate commerce. The government chose to prove this element by showing, through expert testimony, that the gun was manufactured in a state other than that in which Ware possessed it. We have held that expert testimony relating to the location of manufacture of a firearm and an expert's opinion that a firearm has traveled in interstate commerce supplied sufficient evidence to support the interstate commerce element. *United States v. Lowe*, 860 F.2d 1370 (7th Cir.1988), *cert. denied,* — U.S. ——, 109 S.Ct. 1639, 104 L.Ed.2d 155 (1989). Here, however, Ware does not challenge the sufficiency of the evidence used to prove the interstate commerce element. Rather, he argues that the type of evidence used to prove the element is improper under Rule 702.

---

**4.** Ware also raises a sixth amendment objection to Agent Prebe's testimony. However, he did not raise this objection below to preserve it for appellate review and has not demonstrated plain error. *See, e.g., United States v. Molinaro,* 877 F.2d 1341, 1344 n. 1 (7th Cir.1989). He also attempts to challenge the appropriateness of Agent Prebe's testimony concerning the location of Harrington & Richardson's manufacturing

plants because the government was in possession of the defunct company's business records. This argument also was waived because it was not raised in Ware's initial brief to this court. *See, e.g., United States v. Lowe,* 860 F.2d 1370, 1375 (7th Cir.1988), *cert. denied,* — U.S. ——, 109 S.Ct. 1639, 104 L.Ed.2d 155 (1989). Accordingly, we do not address these additional arguments.

The issue of the propriety under Rule 702 of expert testimony relating to the location of a manufacturing plant to prove that firearms had traveled in interstate commerce was directly addressed by the Ninth Circuit in *United States v. Gann*, 732 F.2d 714 (9th Cir.), *cert. denied*, 469 U.S. 1034, 105 S.Ct. 505, 83 L.Ed.2d 397 (1984). The court agreed with the analysis in *United States v. Sickles*, 524 F.Supp. 506, 512 (D.Del.1981), *aff'd*, 688 F.2d 827 (3d Cir.1982), which held that expert testimony on the same issue would be useful to the trier of fact to understand the expert's opinion on the place of manufacture of the firearms and was proper because the ultimate decision as to whether the firearms traveled in interstate commerce remained within the province of the jury. Accordingly, the Ninth Circuit gave deference to and upheld the decision of the district court to allow the expert testimony. *Gann*, 732 F.2d at 724–25. We agree and hold that the district judge did not abuse his discretion under Rule 702 by admitting or refusing to strike the expert testimony of Agent Prebe. His testimony could have been useful to the jury to determine whether the weapon had traveled in interstate commerce. Further, the ultimate decision clearly remained within the province of the jury because the district judge informed the jury that the expert's opinion was not binding and that the government had to prove the interstate commerce element beyond a reasonable doubt.

■ Alternatively, Ware argues that even if the testimony was admissible under Rule 702, it was inadmissible under Rule 703 because it was not based on evidence reasonably relied upon by experts in the field. Rule 703 provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Fed.R.Evid. 703. Ware's argument merits brief discussion. The facts and data relied upon by Agent Prebe included: (i) the markings on the shotgun; (ii) various ATF publications and lists; and (iii) various firearms trade books, magazines, and reference materials. This information was used by Agent Prebe to arrive at his conclusion that the shotgun was manufactured in Massachusetts and traveled across state lines. Of course, experts in the field of firearms identification rely on this type of information with regard to the issue of interstate transportation of firearms and such reliance is reasonable. *See United States v. Clawson*, 831 F.2d 909, 912–13 (9th Cir.1987), *cert. denied*, 488 U.S. 923, 109 S.Ct. 303, 102 L.Ed.2d 322 (1988); *United States v. Harper*, 802 F.2d 115, 121 (5th Cir.1986). Accordingly, we hold that the testimony did not violate Rule 703 and the district court did not abuse its discretion by permitting the expert testimony of Agent Prebe.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is

AFFIRMED.